IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 13, 2016 Session

**JEFFERY LEE MILLER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Montgomery County**
**No. 037842    William R. Goodman, III, Judge**
_____

**No. M2016-00706-CCA-R3-ECN – May 17, 2017**
_____

The Petitioner, Jeffery Lee Miller, appeals the Montgomery County Circuit Court's dismissal of his petition for writ of error coram nobis. The Petitioner seeks relief from his premeditated first degree murder conviction. The Petitioner argues that (1) the coram nobis court erred by determining that due process considerations did not toll the statute of limitations; (2) the coram nobis court abused its discretion by applying an incorrect legal standard regarding reasonable diligence in its order and final judgment; (3) the coram nobis court's grounds for dismissal were erroneous; and (4) the coram nobis court's assessment of the State's open file policy was erroneous. Upon review, we affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and J. ROSS DYER, JJ., joined.

Roger Smith, Nashville, Tennessee, (at trial), and Karen McDonald, Nashville, Tennessee, (on appeal), for the Petitioner, Jeffery Lee Miller.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; John W. Carney, District Attorney General; and Helen O. Young, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On April 28, 1997, the Petitioner was charged with one count of premeditated first degree murder in the shooting death of Josh Kelly. At the conclusion of his first trial, the jury was unable to reach a verdict, and a mistrial was declared. On August 25, 1997, a second trial was held, and the Petitioner was convicted of the charged offense. The facts underlying the Petitioner's conviction are as follows:

The evidence at trial established that on September 1, 1996, the [Petitioner] shot and killed the victim, Josh Kelley. The evidence indicated that earlier that evening, three young ladies, Tennille, Cassie, and Heather, were driving "up and down" Riverside Drive in Clarksville, Tennessee. They visited a motel where Mike Powers, Cassie's boyfriend, was throwing a party. While in the motel room, Tennille saw the [Petitioner] preparing to leave the room, at which point someone handed a gun to him. The [Petitioner] then left the party. Shortly thereafter, the three young ladies decided to go cruising on Riverside Drive again. They pulled in the parking lot of Page and Taylor's Sporting Goods Store to change drivers. As they were changing seats, a young man in the parking lot told them to "suck [his] dick or leave." The three young ladies left the area and returned to the party at the motel.

When they arrived at the motel, the ladies told Mr. Powers about the young man's comment. At this point, Mr. Powers and the [Petitioner], who had returned to the motel, went to the [Petitioner's] car, and the [Petitioner] followed the ladies to the parking lot of Page and Taylor's Sporting Goods Store. According to the [Petitioner's] second statement to the police, upon arrival at the parking lot, the [Petitioner] told Mr. Powers to "get the gun from under the passenger seat." According to at least one witness, when Mr. Powers exited the vehicle, he had a gun in his waistband. The [Petitioner] and Mr. Powers then approached a group of teenagers standing in the parking lot. The evidence at trial indicated that Mr. Powers asked which of them had told his girlfriend to "suck [his] d**k." In response, the victim stepped forward and said, "We don't know you. We don't know your girlfriend. We didn't say anything to anybody." Mr. Powers then pulled the gun from his waistband and pointed it at the victim. According to one witness, the [Petitioner] told Mr. Powers to "cap [the victim]." Mr. Powers lowered the gun to his side, at which point the [Petitioner] took the gun out of Mr. Powers' hand. The [Petitioner] cocked the gun, pulled the slide back, pointed the gun at the ground in front of the victim's feet, and fired. The [Petitioner] then raised the gun, pointed it at the victim's chest, and fired. After the shooting, the [Petitioner] and Mr. Powers left the scene.

The Petitioner received a sentence of life with the possibility of parole.[1] In his direct appeal, the Petitioner challenged the sufficiency of the evidence arguing that the shooting was an accident and that he was high on cocaine and unable to form the necessary intent. This court affirmed the conviction on direct appeal, and the Tennessee Supreme Court denied permission to appeal. State v. Jeffery Miller, No. 01C01-9801-CC-00029, 1999 WL 398188, at *1 (Tenn. Crim. App. June 18, 1999). Thereafter, the Petitioner filed a petition for post-conviction relief, alleging that his trial counsel was ineffective because he failed to call his co-defendant, Michael Powers, as a witness. He also challenged the failure to charge the lesser included offenses of premeditated first degree murder. Jeffery Lee Miller v. State, M2003-02841-CCA-R3-PC, 2005 WL 901130 at *1 (Tenn. Crim. App. Apr. 19, 2005). The Petitioner also filed a petition for writ of habeas corpus. Jeffery Miller v. Jewell Steele, Warden, M2012-01628-CCA-R3-HC, 2013 WL 3872835, at *1 (Tenn. Crim. App. July 24, 2013). This court affirmed the denial and dismissal of his petition for post-conviction relief and writ of habeas corpus.

On July 21, 2015, nearly eighteen years following his conviction, the Petitioner, through counsel, filed a petition for writ of error coram nobis alleging that he had "newly discovered evidence which may have resulted in a different judgment or a different punishment had the evidence been presented at his trial." After requesting his investigative file from the Clarksville District Attorney's Office, the Petitioner discovered additional statements from two key witnesses, Jeremy Gibbs and Matthew Bryant. Jeremy Gibbs testified on behalf of the State in the Petitioner's trial, and Matthew Bryant testified as a State witness in the trial of Michael Powers, the Petitioner's co-defendant. Prior to the Petitioner requesting his investigative file, the only statement he had was Detective Cheryl Anderson's handwritten version of Gibbs' statement.

The Petitioner claims that Gibbs' handwritten statement was "significant" because it contained additional information that was not "conveyed in the question-and-answer statement written by Detective Cheryl Anderson." Gibbs' handwritten statement included a description of the Petitioner that varied from "Gibbs's trial statement and his statement at the preliminary hearing." Finally, Gibbs' handwritten statement included "his admission that he entered the crime scene and picked up one of the shell casings." The Petitioner claims that Gibbs' statement could have been used to "damage[] the integrity of the . . . investigation and the credibility of the prosecution's law enforcement witnesses" and show that "the crime scene was not secure, that no log of persons at the

---

[1] This court's opinion regarding the petition for post-conviction relief erroneously stated that the Petitioner received a sentence of life without the possibility of parole. However, the judgment form states that the Petitioner received a sentence of life.

scene was disclosed, and that the prosecution witnesses did not report . . . Gibbs's tampering with the evidence."

The Petitioner also asserts that Bryant's statement was important because this statement "[was] consistent with [the Petitioner's] testimony and [was] inconsistent with the version of events related by the prosecution witnesses." Bryant's statement was handwritten by Bryant and then typed by the Clarksville Police Department. In Bryant's statement, he claimed that the Petitioner fired two shots at the ground and then left the scene. The Petitioner argues that this statement corroborates his "defense that the shots were not fired at the victim and that the shooting was not premeditated." The Petitioner asserts that he was not at fault in failing to present the alleged newly discovered evidence because he did not discover the two witness statements until he received the investigative file in August 2014.

Attached to the petition were affidavits signed by the Petitioner, the Petitioner's counsel, whom we will refer to as appellate counsel, and Chris M. Jones, a former Shelby County Sheriff and alleged expert in the field of police practices. In the Petitioner's affidavit, he explained that he requested his investigative file from the Clarksville District Attorney's Office, which he received in late August 2014. He claimed that there were two witness statements he had never seen and that he "had no knowledge of the contents of these statements." The Petitioner also claimed that trial counsel never discussed the contents of these two statements with the Petitioner, and he believed that trial counsel was not aware of these witness statements. The affidavit from appellate counsel stated that both the Petitioner and appellate counsel sent letters to trial counsel asking him if he received the two witness statements at issue. Trial counsel did not respond to the Petitioner's or appellate counsel's letters. In the third affidavit, Jones stated that the Clarksville Police Department failed to secure the crime scene and that "[t]he contamination of the crime scene and the tampering with the evidence [by Gibbs] were not logged or reported" and the contamination was not "disclosed by testimony at either of [the Petitioner's] trials."

On December 14, 2015, the court conducted a hearing on the petition for writ of error coram nobis. Prior to the hearing, the coram nobis court asked appellate counsel why the petition was not barred by the one-year statute of limitations. Appellate counsel argued that it was not the Petitioner's fault but rather "external conduct" that prevented the Petitioner from reviewing the two witness statements. The court then asked if trial counsel was "arguably ineffective" since he could have obtained the witness statements by interviewing the two witnesses. Appellate counsel stated that (1) Bryant was not listed as a witness in the Petitioner's trial, and (2) although Gibbs did testify at the Petitioner's trial, trial counsel never received his handwritten statement so "counsel never questioned him on that." The State argued that Gibbs was questioned about his

handwritten statement during the Petitioner's trial and that Bryant was subpoenaed to testify at the Petitioner's and Power's trial before their cases were severed. The State also argued that Bryant testified at Power's trial, and trial counsel could have obtained a copy of Bryant's testimony at any time. Furthermore, the State claimed that the Petitioner's affidavit in support of his petition did not satisfy the requirements of the coram nobis statute because the affidavits were not based on "[f]irst hand knowledge of what occurred." The State also noted that there was no affidavit from the Petitioner's trial counsel.[2]

The Petitioner testified that his defense at trial was that he was intoxicated and that he was "fleeing from the scene when the second shot was fired." Therefore, any statements that could have corroborated his testimony would have been helpful at trial. When the Petitioner received his investigative file from the Clarksville District Attorney's Office there were several undisclosed witness statements from Gibbs and Bryant. The Petitioner remembered discussing one of Gibbs' statements, which was handwritten by Detective Anderson, prior to trial. However, the Petitioner had never seen the second statement, which was handwritten by Gibbs, and was more detailed than the statement written by Detective Anderson. The first time the Petitioner saw Gibbs' handwritten statement was August 6, 2014. In Gibbs' handwritten statement, he stated that he picked up an empty shell casing and tried to give it to a police officer on the scene but the officer told him to put it back where he found, and he did. Gibbs' statement also described the Petitioner as "possibly Hispanic" with a bald head and sideburns. The Petitioner claimed that he never discussed this statement with trial counsel.

Next, the Petitioner testified that he never discussed Bryant's handwritten or typewritten statements. The Petitioner argued that he was not aware of this witness and that he never saw Bryant's statements until he received the investigative file in 2014. In Bryant's statements, he claimed that the Petitioner "took the gun and aimed down at Josh's legs and shot twice. Then they just walked to their car and drove off." The Petitioner believed that this statement was significant because it corroborated the Petitioner's version of events and "would show that it [sic] was no intent." The Petitioner also testified that it took him two years to receive the investigative file from the District Attorney's Office.

On cross-examination, the Petitioner acknowledged that he was not "a hundred percent" certain that trial counsel did not receive the two witness statements. The Petitioner stated that he was unaware that evidence had been moved at the crime scene until he received Gibbs' handwritten statement. The Petitioner then read excerpts of his trial transcript where Gibbs testified that he picked up a live round and left the empty

---

[2] The Petitioner's trial counsel did not testify at the coram nobis hearing.

shell casing on the ground. The Petitioner argued that Gibbs' testimony differed from his handwritten statement because in the handwritten statement, Gibbs said he picked up a shell casing. He claimed that Gibbs could have been impeached by this inconsistency at trial. The Petitioner also claimed that Gibbs statement was important because he described the Petitioner as "possibly Hispanic" with a bald head and sideburns. The State then pointed out that in his second trial, Gibbs testified that "everything went blank" and the Petitioner agreed that he "was not that good of a witness." The Petitioner asserted that trial counsel could have had a stronger cross-examination of Gibbs if he had his handwritten statement.

The Petitioner also acknowledged that his case was severed from his co-defendant's the morning of trial, and he was not aware that Bryant was subpoenaed to testify. He claimed Bryant's statement could have been used at trial to show that the shooting was an accident. However, he agreed that Bryant's statement did not say that the shooting was an accident and that the statement said the Petitioner fired two shots at the ground and then left the scene. He asserted that this statement could show that the bullet ricocheted off the ground and killed the victim. The Petitioner also read portions of the statement he gave to Detective Anderson, and he agreed that his statement did not say anything about the gun firing accidently. The Petitioner agreed that he never requested the investigative file from Detective Anderson and only filed his request with the District Attorney's Office.

Detective Anderson testified that she was the lead detective on the Petitioner's case. She testified that it was her normal practice to write out a defendant's statement because her handwriting was "more legible than most people." When asked why there were two handwritten statements for Gibbs, she explained that Gibbs arrived at the police station and began writing his statement with another detective. When Detective Anderson arrived, she spoke with Gibbs and her handwritten statement contained the content of that conversation. She explained that her handwritten statement consisted of "questions [she] had about his statement." Detective Anderson agreed that the crime scene was a "cluster" and that when police arrived, they secured the scene. She also acknowledged that at some point, Gibbs picked up either a bullet or a shell casing and was told to put it back where he found it. Finally, Detective Anderson remembered having a pre-trial conference with the Petitioner's trial counsel where she gave trial counsel a complete copy of her case file.

On cross-examination, Detective Anderson stated that she was not "coached" by the District Attorney's Office before the hearing and that she was never asked to withhold any information from the defense. She recalled that the District Attorney's Office had an open file discovery policy and that she reviewed her case file with the Petitioner's trial counsel. She reiterated that her handwritten statement of Gibbs' interview contained only

"follow-up questions" to the statement Gibbs had already written. Detective Anderson recalled that the Petitioner's and Powers' cases were severed the morning of trial but that there was no change in the State's proof and that Bryant testified at Powers' trial. After reading excerpts of her trial testimony from Powers' trial, Detective Anderson agreed that no issue was raised regarding how Gibbs' statement was taken or the location of the live rounds and shell casing that were found on the scene. Detective Anderson also recalled that the medical examiner testified that the bullet entered the victim's "center sternum and at a downward trajectory rested in the small of his back." There was no testimony consistent with the bullet ricocheting off the ground or that would corroborate the Petitioner's theory that the shooting was an accident.

Assistant District Attorney (ADA) Helen Young testified that she was the prosecuting attorney in the Petitioner's first and second trial. She testified that at the time of the Petitioner's trial, the District Attorney's Office had an open file discovery policy, meaning that the detectives would give her a "complete case file and copies and the [d]efense [would get] everything that [she] gets." ADA Young was "ninety-nine point nine percent certain" that both of Gibbs' statements were given to the defense at the time of the preliminary hearing. She also testified that she gave trial counsel Bryant's statements and that she questioned Bryant about his statements during Powers' trial. ADA Young agreed that the Petitioner's trial counsel was not obligated to sit through Power's trial but that trial counsel was present for most of the trial. During the Petitioner's first trial, ADA Young objected when trial counsel asked Detective Anderson about the location of the live round and the shell casing. ADA Young explained that her objection was based on the form of the question because it asked Detective Anderson to speculate about where the live round and shell casing were found. Furthermore, she testified that trial counsel eventually questioned Gibbs about moving either the shell casing or the live round during the Petitioner's trial.

After considering the arguments of counsel, the coram nobis court denied the petition because it was barred by the one-year statute of limitation. The coram nobis court further found that the alleged newly discovered evidence "would not have [resulted in] a different judgment" and filed a written order dismissing the petition on March 10, 2016. The written order did not explicitly conclude that the petition was barred by the statute of limitations. Rather, it denied relief reasoning that the Petitioner had the opportunity "through the 'exercise of reasonable diligence' to have obtained copies of all prior [witness] statements" given that he had two separate trials. It is from this order that the Petitioner now timely appeals.

## ANALYSIS

On appeal, the Petitioner argues that (1) the coram nobis court erred by determining that due process considerations did not toll the statute of limitations; (2) the coram nobis court abused its discretion by applying an incorrect legal standard regarding reasonable diligence in the order and the final judgment; and (3) the coram nobis court's grounds for dismissal were erroneous; and (4) the coram nobis court made an erroneous assessment of the State's open file policy.[3] The State contends that the coram nobis court properly dismissed the petition because it was time-barred and without merit. After a careful review of the record, we agree with the State.

A writ of error coram nobis is available to convicted defendants. T.C.A. § 40-26-105(a). However, a writ of error coram nobis is an "extraordinary procedural remedy" that "fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999). Relief by petition for writ of error coram nobis is provided for in Tennessee Code Annotated section 40-26-105. The statute provides, in pertinent part:

> (b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

T.C.A. § 40-26-105(b). To seek coram nobis relief, the petitioner must establish that he or she was "'without fault' in failing to present the evidence at the proper time." Harris v. State, 102 S.W.3d 587, 592-93 (Tenn. 2003). A petitioner is "without fault" if he or she is able to show that "the exercise of reasonable diligence would not have led to a timely discovery of the new information." State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007). The coram nobis court will then determine "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." Id. "The decision to grant or deny a petition for the writ of error coram nobis rests within the sound discretion of the trial court, and this court's review of this issue is limited to determining whether the trial court abused its discretion." State v. Hall, 461 S.W.3d 469, 496 (Tenn. 2015) (citing Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly

---

[3] The issues have been reordered for clarity.

erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." Wilson v. State, 367 S.W.3d 229, 235 (Tenn. 2012) (citing Wright ex rel. Wright v. Wright, 337 S.W.3d 166, 176 (Tenn. 2011)).

"To qualify as newly discovered evidence, the evidence must have been unknown to the defendant at the time of trial." Harris, 301 S.W.3d at 160 (Koch, J., concurring in part and concurring in result) (internal footnote omitted). "A narrow exception exists to this requirement, where 'although not newly discovered evidence, in the usual sense of the term,' the 'availability' of the evidence 'is newly discovered.'" Id. at 160-61. Furthermore, "[i]mpeachment evidence might be particularly compelling under the circumstances of a particular case. Moreover, a complete restriction on the availability of coram nobis relief in the case of any newly discovered impeachment evidence would be inconsistent with the discretion afforded to our trial courts." Vasques, 221 S.W.3d at 528. However, "the ultimate question is the effect of the newly discovered evidence on the outcome" when viewed in light of Mixon, Workman, and Vasques. Id.

The statute of limitations for a petition for writ of error coram nobis is one year from the date the judgment becomes final in the trial court. T.C.A. § 27-7-103; Mixon, 983 S.W.2d at 671. For the purposes of a coram nobis petition, a judgment becomes final thirty days after the entry of the trial court's judgment if no post-trial motions are filed or upon entry of an order disposing of a timely post-trial motion. Mixon, 983 S.W.2d at 670 (citing Tenn. R. App. P. 4(c); State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996)). Due process considerations may toll the one-year statute of limitations when a petitioner seeks a writ of error coram nobis. Harris, 301 S.W.3d at 145. The State has the burden of raising the statute of limitations bar as an affirmative defense in a coram nobis proceeding. Harris, 301 S.W.3d at 144 (citing Harris, 102 S.W.3d at 593). Whether a claim is barred by the statute of limitations is a question of law, which this court reviews de novo. Id. (citing Brown v. Erachem Comilog, Inc., 231 S.W.3d 918, 921 (Tenn. 2007)).

(1) Statute of Limitations. Here, the Petitioner's judgment was entered on August 28, 1997. His judgment became final thirty days later; however, his petition for writ of error coram nobis was not filed until July 21, 2015, well outside the statute of limitations. The Petitioner argues that due process considerations require tolling the statute of limitations, since he was unaware of the two statements until he received his investigative file in August 2014. See Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001) (holding that due process concerns may require that the statute of limitations for filing a petition for a writ of error coram nobis be tolled). To determine whether due process concerns require a tolling of the statute of limitations, "a court must weigh the petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's

interest in preventing stale and groundless claims." Id. In weighing these interests, courts should use the following test:

> (1) determine when the limitations period would normally have begun to run;
> (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and
> (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995).

Here, the limitations period would have begun to run on September 27, 1997, which is thirty days after his petition became final, since it appears that no post-trial motions were filed in this case. Therefore, the statute of limitations would have expired one year later on September 27, 1998. Again, the Petitioner did not file his petition for writ of error coram nobis until July 21, 2015, almost seventeen years after the statute of limitations lapsed. Next, we must determine whether the grounds for relief arose after the statute of limitations would normally have commenced. The Petitioner received the investigative file containing the alleged newly discovered evidence in August 2014, which was after the limitations period commenced. Despite the Petitioner's testimony that he was unaware of this evidence until August 2014, his grounds for relief did not arise after the one-year statute of limitations commenced. There is simply no testimony or explanation as to why the Petitioner waited nearly seventeen years to request his investigative file. In any event, Detective Anderson testified that the Petitioner's trial counsel was given a copy of her investigative file before the Petitioner's first trial. ADA Young testified that the District Attorney's Office had an open file discovery policy and that she was "ninety-nine point nine percent certain" that both witness statements were provided to trial counsel. The coram nobis court accredited the testimony of the State's witnesses on this issue, and this court will not disturb that finding. See State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. July 19, 1995).

Furthermore, the only evidence the Petitioner provided at the coram nobis hearing was his belief that the two witness statements were not provided to trial counsel. The Petitioner claims that he never discussed Gibbs' second handwritten statement and that he did not know of Bryant before he received the investigative file in August 2014. The Petitioner assumes that trial counsel never received these statements since trial counsel did not discuss these statements with him. However, trial counsel did not testify at the coram nobis hearing; thus, we are unable to conclude that trial counsel did not receive the two witness statements at issue. Moreover, the Petitioner acknowledged that he cannot

be "[one] hundred percent" certain that trial counsel did not receive these witness statements. Accordingly, we conclude that the Petitioner's ground for relief did not arise after the one-year statute of limitations commenced. In light of this determination, we do not need to consider whether a strict application of the statute of limitations would deny the Petitioner a reasonable opportunity to present his claim.

In considering whether the statute of limitations is tolled for due process concerns, we note that an evidentiary hearing on the petition for writ of error coram nobis was conducted in this case. In the order denying relief, the coram nobis court did not address whether the statute of limitations should be tolled in this case. However, at the conclusion of the coram nobis hearing, the court found that the petition was time-barred and, even if it was not barred, the court found that the statements would not have led to a different judgment. Based on the record and the transcript from the coram nobis hearing, we decline to toll the statute of limitations in this case. However, in the event of further review, we will address the Petitioner's remaining claims. See Arthur L. Armstrong v. State, No. M2008-02328-CCA-R3-CO, 2010 WL 2977890, at * 12 (Tenn. Crim. App. July 30, 2010) (This court refrained from tolling the statute of limitations but felt that the interests of justice and the possibility of further review required an examination of the petitioner's claim on its merits since an evidentiary hearing had been conducted.).

(2) Standard of Review. The Petitioner argues that the coram nobis court used the "incorrect legal standard" at the conclusion of its order denying the petition and in the final judgment. The State concedes that the court used the "would have standard" that was rejected in Vasques when it determined that the "the written statements would [not] have [led] to a different result." Vasques, 221 S.W.3d at 527. Here, we are unable to conclude that the coram nobis court used the incorrect legal standard. Initially, the trial court found that "through the 'exercise of reasonable diligence'" the Petitioner could have obtained all prior statements of Gibbs and Bryant. It additionally determined that the two witness statements at issue "would [not] have [led] to a different result." Although the coram nobis court used the "would have" standard rejected in Vasques, this does "not necessarily signify the application of an incorrect legal standard." See Wilson v. State, No. M2013-01807-CCA-R3-CO, 2014 WL 3748573, at *6 (Tenn. Crim. App. July 30, 2014). At the conclusion of the coram nobis hearing, the court applied the "may have" standard and denied the petition. This court in Wilson addressed a similar issue and reasoned as follows:

> Here, the coram nobis court expressly applied the "may have" standard elsewhere in its findings; therefore, this court views the coram nobis court's "would not have" formulation as its attempt to create the negative form of the correct "may have" standard. As Judge Witt observed, the more proper negative form of the "may have" standard is "could not have," and we

- 11 -

encourage court's in the use of that term. However, due to the coram nobis court's use of the proper "may have" standard elsewhere in its order, we hold that the proper legal standard was applied despite the court's use of an improper negative formulation.

Wilson, 2014 WL 3748573, at *6. Based on the same reasoning, we conclude that the trial court applied the proper legal standard in denying the petition. The Petitioner is not entitled to relief.

(3) Grounds for Dismissal. Next, the Petitioner generally contends that the coram nobis court's grounds for dismissal were erroneous. The Petitioner argues that the coram nobis court provided an "erroneous assessment" of the two witness statements in its order denying the petition. The Petitioner asserts that Gibbs' statement could have been used for impeachment and to "dispute the chain of custody presented at trial . . . and discredit the prosecution's proof of the entire investigation." The coram nobis court concluded, and we agree, that the witness statements could only be used for impeachment purposes. First, the Petitioner alleges he could have impeached Gibbs because in the undisclosed handwritten statement, Gibbs described the Petitioner as "possibly Hispanic" with a bald head and sideburns. While impeachment evidence can serve as a basis for coram nobis relief, the Petitioner has not established that this evidence alone might have led to a different outcome. See Vasques, 221 S.W.3d at 527. In his brief, the Petitioner admits that despite Gibbs' description of the Petitioner, Gibbs was able to identify the Petitioner at trial. Furthermore, after reviewing Gibbs' statement, he specifically stated that the Petitioner "looked white, possibly Hispanic," therefore; Gibbs description did not provide strong impeachment evidence. Accordingly, we conclude that the trial court did not abuse its discretion in denying relief on this ground.

The Petitioner further argues that Gibbs' handwritten statement could have been used to "dispute the chain of custody presented at trial . . . and discredit the prosecution's proof of the entire investigation." In Gibbs' handwritten statement, Gibbs stated that he picked up a shell casing and was told by a police officer to put it back where he found it. During the coram nobis hearing, the Petitioner testified that he did not know that evidence had been moved at the crime scene until he received Gibbs' statement. However, during the hearing, the Petitioner read portions of the trial transcript where Gibbs testified that he "picked up a live round." Therefore, trial counsel and the Petitioner knew that the evidence had been moved at the crime scene and had the opportunity at trial to further question Gibbs and Detective Anderson. The Petitioner further insists that Bryant's statement corroborated the Petitioner's versions of events at trial and "would have been valuable to the [P]etitioner's defense." Specifically, the Petitioner argues that Bryant's statement is exculpatory because it "corroborates [the Petitioner's] defense that the shots were not fired at the victim and that the shooting was

not premeditated." However, Bryant never said that the shooting was an accident or that the Petitioner was fleeing when he fired the second shot. Rather, his statement said that the Petitioner fired two shots at the ground in front of the victim and then left the scene. There is nothing in Bryant's statement that establishes that the shooting was an accident or that corroborates the Petitioner's version of events. Therefore, the Petitioner has failed to prove that Gibbs or Bryant's statement, if introduced at his second trial, "may have led to a different result." Vasques, 221 S.W.3d at 527. The Petitioner is not entitled to relief.

(4) Open File Policy. The Petitioner argues in his reply brief that the coram nobis court made an erroneous assessment of the State's open file policy. During the hearing, the coram nobis court stated that based on his experience "as an attorney practicing in this district[,]" the District Attorney's Office had an open file discovery policy. The Petitioner argues that the coram nobis court relied on "his own knowledge" and "essentially [took] judicial notice of the open file policy." While we do not condone the coram nobis court commenting on his personal experience as an attorney during the hearing, the record shows that ADA Young and Detective Anderson testified that, at the time of the Petitioner's trial, there was an open file discovery policy at the District Attorney's Office. The court accredited their testimony, and we will not disturb this finding. Moreover, the Petitioner failed to provide any evidence other than his belief that the statements were withheld by the State. As we have already established, the two witness statements were wholly immaterial; thus, the coram nobis court did not abuse its discretion in denying relief.

## CONCLUSION

Based on the aforementioned reasoning and authorities, we affirm the judgment of the coram nobis court.

_____
CAMILLE R. McMULLEN, JUDGE

- 13 -